IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARY A. MURPHY, | ) | CASE NO. 3:14 CV 1115 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## Introduction

**A.      Nature of the case and proceedings**

Before me[1] is an action by Mary A. Murphy under 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security denying her applications

for disability insurance benefits and supplemental security income.[2] The Commissioner has

answered[3] and filed the transcript of the administrative record.[4] Under my initial[5] and

---

[1] ECF # 11. The parties have consented to my exercise of jurisdiction.

[2] ECF # 1.

[3] ECF # 7.

[4] ECF # 8.

[5] ECF # 5.

procedural[6] orders, the parties have briefed their positions[7] and filed supplemental charts[8] and the fact sheet.[9]

**B.    Background facts and decision of the Administrative Law Judge ("ALJ")**

Murphy, who was 36 years old at the time of the administrative hearing,[10] has a high school education,[11] is divorced with three children,[12] and currently lives alone, except when her children are with her.[13]

The ALJ, whose decision became the final decision of the Commissioner, found that Murphy had the following severe impairments: obesity; depression; fibromyalgia; neuropathy of the lower extremities; status post fusion and laminectomy of the lumbar spine with mild degenerative disc disease.[14]

After concluding that the relevant impairments did not meet or equal a listing, the ALJ made the following finding regarding Murphy's residual functional capacity ("RFC"):

---

[6] ECF # 9.

[7] ECF # 12 (Murphy's brief); ECF # 16 (Commissioner's brief); ECF # 19 (Murphy's reply brief).

[8] ECF # 13 at 4-13 (Murphy's charts); ECF # 16-1 (Commissioner's charts).

[9] ECF # 13 at 2-3 (Murphy's fact sheet).

[10] Transcript ("Tr.") at 23, 25.

[11] *Id.* at 23, 242.

[12] *Id.* at 35.

[13] *Id.* at 35-36.

[14] *Id.* at 13.

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is able to perform work that does not involve more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps and stairs, and no climbing of ladders, ropes, or scaffolds. The claimant is able to perform unskilled work where the pace of productivity is not dictated by an external source over which she has no control, such as assembly lines and conveyor belts. Lastly, the claimant is able to perform work with frequent contact with the public and supervisors, and no tandem work assignments with coworkers.[15]

The ALJ decided that this residual functional capacity precluded Murphy from performing her past relevant work as an assembler and medical receptionist.[16]

Based on an answer to a hypothetical question posed to the vocational expert at the hearing setting forth the RFC finding quoted above, the ALJ determined that a significant number of jobs existed locally and nationally that Murphy could perform.[17] The ALJ, therefore, found Murphy not under a disability.[18]

## C.    Issues on judicial review and decision

---

[15] *Id.* at 15-16.

[16] *Id.* at 23.

[17] *Id.* at 24.

[18] *Id.*

Murphy asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Murphy presents the following issues for judicial review:

- The ALJ found at step three of the sequential evaluation process that Murphy did not have an impairment or combination of impairments that meets or medically equals the listings in Section 12.04 of the Appendix of Listings. Does substantial evidence support this finding?[19]

- The ALJ found at step four of the sequential evaluation process that Murphy has the residual functional capacity to perform sedentary work. Does substantial evidence support this finding?[20]

- The ALJ further found that there are jobs that exist in significant numbers in the national economy that Murphy can perform. Does substantial evidence support this finding?[21]

For the reasons that follow, I will conclude that the ALJ's finding of no disability is not supported by substantial evidence and, therefore, must be reversed, with the matter remanded for further proceedings.

## Analysis

---

[19] ECF # 12 at 2.

[20] *Id.*

[21] *Id.*

## A.     Standards of review

### 1.     *Substantial evidence*

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "
>
> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[22]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner survives "a directed verdict" and wins.[23] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[24]

---

[22] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

[23] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06CV403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[24] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

I will review the findings of the ALJ at issue here consistent with that deferential standard.

**2.      *Treating physician rule and good reasons requirement***

The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances.

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.[25]

If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight.[26]

The ALJ has the ultimate responsibility for determining whether a claimant is disabled.[27] Conclusory statements by the treating source that the claimant is disabled are not entitled to deference under the regulation.[28]

---

[25] 20 C.F.R. § 404.1527(d)(2).

[26] *Id.*

[27] *Schuler v. Comm'r of Soc. Sec.*, 109 F. App'x 97, 101 (6th Cir. 2004).

[28] *Id.*

-6-

The regulation does cover treating source opinions as to a claimant's exertional limitations and work-related capacity in light of those limitations.[29] Although the treating source's report need not contain all the supporting evidence to warrant the assignment of controlling weight to it,[30] nevertheless, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" to receive such weight.[31] In deciding if such supporting evidence exists, the Court will review the administrative record as a whole and may rely on evidence not cited by the ALJ.[32]

In *Wilson v. Commissioner of Social Security*,[33] the Sixth Circuit discussed the treating source rule in the regulations with particular emphasis on the requirement that the agency "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination.[34] The court noted that the regulation expressly contains a "good reasons" requirement.[35] The court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must do the following:

---

[29] *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 991 (N.D. Ohio 2003), citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2nd Cir. 2003).

[30] *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).

[31] *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).

[32] *Id.* at 535.

[33] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

[34] *Id.* at 544.

[35] *Id.*, citing and quoting 20 C.F.R. § 404.1527(d)(2).

- State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record.

- Identify evidence supporting such finding.

- Explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion.[36]

The court went on to hold that the failure to articulate good reasons for discounting the treating source's opinion is not harmless error.[37] It drew a distinction between a regulation that bestows procedural benefits upon a party and one promulgated for the orderly transaction of the agency's business.[38] The former confers a substantial, procedural right on the party invoking it that cannot be set aside for harmless error.[39] It concluded that the requirement in § 1527(d)(2) for articulation of good reasons for not giving controlling weight to a treating physician's opinion created a substantial right exempt from the harmless error rule.[40]

The Sixth Circuit in *Gayheart v. Commissioner of Social Security*[41] recently emphasized that the regulations require two distinct analyses, applying two separate

---

[36] *Id.* at 546.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013).

standards, in assessing the opinions of treating sources.[42] This does not represent a new interpretation of the treating physician rule. Rather it reinforces and underscores what that court had previously said in cases such as *Rogers v. Commissioner of Social Security*,[43] *Blakley v. Commissioner of Social Security*,[44] and *Hensley v. Astrue*.[45]

As explained in *Gayheart*, the ALJ must first consider if the treating source's opinion should receive controlling weight.[46] The opinion must receive controlling weight if (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the administrative record.[47] These factors are expressly set out in 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Only if the ALJ decides not to give the treating source's opinion controlling weight will the analysis proceed to what weight the opinion should receive based on the factors set forth in 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii), (3)-(6) and §§ 416.927(d)(2)(i)-(ii), (3)-(6).[48] The treating source's non-controlling status

---

[42] *Id.* at 375-76.

[43] *Rogers*, 486 F.3d at 242.

[44] *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406-07 (6th Cir. 2009).

[45] *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009).

[46] *Gayheart*, 710 F.3d at 376.

[47] *Id.*

[48] *Id.*

notwithstanding, "there remains a presumption, albeit a rebuttable one, that the treating physician is entitled to great deference."[49]

The court in *Gayheart* cautioned against collapsing these two distinct analyses into one.[50] The ALJ in *Gayheart* made no finding as to controlling weight and did not apply the standards for controlling weight set out in the regulation.[51] Rather, the ALJ merely assigned the opinion of the treating physician little weight and explained that finding by the secondary criteria set out in §§ 1527(d)(i)-(ii), (3)-(6) of the regulations,[52] specifically the frequency of the psychiatrist's treatment of the claimant and internal inconsistencies between the opinions and the treatment reports.[53] The court concluded that the ALJ failed to provide "good reasons" for not giving the treating source's opinion controlling weight.[54]

> But the ALJ did not provide "good reasons" for why Dr. Onady's opinions fail to meet either prong of this test.
>
> To be sure, the ALJ discusses the frequency and nature of Dr. Onady's treatment relationship with *Gayheart*, as well as alleged internal inconsistencies between the doctor's opinions and portions of her reports. But these factors are properly applied only after the ALJ has determined that a treating-source [sic] opinion will not be given controlling weight.[55]

---

[49] *Rogers*, 486 F.3d at 242.

[50] *Gayheart*, 710 F.3d at 376.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

-10-

In a nutshell, the *Wilson/Gayheart* line of cases interpreting the Commissioner's regulations recognizes a rebuttable presumption that a treating source's opinion should receive controlling weight.[56] The ALJ must assign specific weight to the opinion of each treating source and, if the weight assigned is not controlling, then give good reasons for not giving those opinions controlling weight.[57] In articulating good reasons for assigning weight other than controlling, the ALJ must do more than state that the opinion of the treating physician disagrees with the opinion of a non-treating physician[58] or that objective medical evidence does not support that opinion.[59]

The failure of an ALJ to follow the procedural rules for assigning weight to the opinions of treating sources and the giving of good reason for the weight assigned denotes a lack of substantial evidence even if the decision of the ALJ may be justified based on the record.[60] The Commissioner's *post hoc* arguments on judicial review are immaterial.[61]

Given the significant implications of a failure to properly articulate (*i.e.*, remand) mandated by the *Wilson* decision, an ALJ should structure the decision to remove any doubt

---

[56] *Rogers*, 486 F.3d 234 at 242.

[57] *Blakley*, 581 F.3d at 406-07.

[58] *Hensley*, 573 F.3d at 266-67.

[59] *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010).

[60] *Blakley*, 581 F.3d at 407.

[61] *Wooten v. Astrue*, No. 1:09-cv-981, 2010 WL 184147, at *8 (N.D. Ohio Jan. 14, 2010).

as to the weight given the treating source's opinion and the reasons for assigning such weight. In a single paragraph the ALJ should state what weight he or she assigns to the treating source's opinion and then discuss the evidence of record supporting that assignment. Where the treating source's opinion does not receive controlling weight, the decision must justify the assignment given in light of the factors set out in §§ 1527(d)(1)-(6).

The Sixth Circuit has identified certain breaches of the *Wilson* rules as grounds for reversal and remand:

- the failure to mention and consider the opinion of a treating source,[62]

- the rejection or discounting of the weight of a treating source without assigning weight,[63]

- the failure to explain how the opinion of a source properly considered as a treating source is weighed (*i.e.*, treating v. examining),[64]

- the elevation of the opinion of a nonexamining source over that of a treating source if the nonexamining source has not reviewed the opinion of the treating source,[65]

- the rejection of the opinion of a treating source because it conflicts with the opinion of another medical source without an explanation of the reason therefor,[66] and

---

[62] *Blakley*, 581 F.3d at 407-08.

[63] *Id.* at 408.

[64] *Id.*

[65] *Id.* at 409.

[66] *Hensley*, 573 F.3d at 266-67.

-12-

- the rejection of the opinion of a treating source for inconsistency with other evidence in the record without an explanation of why "the treating physician's conclusion gets the short end of the stick."[67]

The Sixth Circuit in *Blakley*[68] expressed skepticism as to the Commissioner's argument that the error should be viewed as harmless since substantial evidence exists to support the ultimate finding.[69] Specifically, *Blakley* concluded that "even if we were to agree that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error."[70]

In *Cole v. Astrue*,[71] the Sixth Circuit reemphasized that harmless error sufficient to excuse the breach of the treating source rule only exists if the opinion it issues is so patently deficient as to make it incredible, if the Commissioner implicitly adopts the source's opinion or makes findings consistent with it, or if the goal of the treating source regulation is satisfied despite non-compliance.[72]

## B.    Application of standards

---

[67] *Friend*, 375 F. App'x at 551-52.

[68] *Blakley*, 581 F.3d 399.

[69] *Id.* at 409-10.

[70] *Id.* at 410.

[71] *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011).

[72] *Id.* at 940.

This case centers on the issue of whether Murphy met or equaled Listing 12.04, the answer to which involves the question of whether the ALJ properly analyzed three medical opinions from treating sources. The analysis of these medical opinions also is a factor in the claim that the RFC was not properly formed. I will address first the issue of meeting the listing and then the question concerning the RFC.

### 1.      The listing

Murphy contends that the ALJ erred at step three[73] of the sequential evaluation process by finding that she did not meet or equal Listing 12.04. In that regard, she argues that all her treating physicians "agree that [she] suffers from either major depressive syndrome or depression"[74] and further contends that all these physicians found various impairments sufficient to show Murphy met both the A and B criteria of Listing 12.04.[75]

The ALJ specifically considered Listing 12.04 – which addresses mental impairments – and found in particular that the "B" criteria, where the claimant must show at least two of the listed factors,[76] had not been met in Murphy's case.[77] In making this finding, the ALJ

---

[73] Murphy incorrectly states that the determination of meeting or equaling a listing is at step four of the sequential evaluation process. ECF # 12 at 5. It is step three.

[74] *Id.* at 6.

[75] *Id.* at 6-10.

[76] To satisfy the "B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily life; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration. *See*, Tr. at 14.

[77] *Id.*

acknowledged that Murphy had some restrictions – mild or moderate –  as regards to activities of daily life, social functioning and concentration, persistence, and pace, but concluded that the limitations were not of a "marked" nature.[78] The ALJ also found that Murphy had experienced no episodes of decompensation that were of an extended duration.[79] Finally, the ALJ made a point to emphasize that the limitations addressed in the "B" criteria are not assessments of residual functional capacity, but that such an assessment involves a "more detailed" consideration of the various functions set out in the listing of impairments.[80]

In reviewing Murphy's argument, I note initially that it is the claimant who has the burden of proving that she meets a listing,[81] and she must show that she meets every requirement of the listing.[82] Further, an ALJ may support a decision at step three denying that a claimant has met or equaled a listing with findings in another part of the opinion or by reference to an exhibit.[83] But, in any event, even if the ALJ's reasoning is "cursory," any

---

[78] *Id.*

[79] *Id.* at 15.

[80] *Id.*

[81] *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (citations omitted).

[82] *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

[83] *Forrest*, 591 F. App'x at 366 (citations omitted).

error in articulation may be harmless if the claimant has failed to meet her burden at step three.[84]

That said, I observe first that although Dr. Wentz[85] and Dr. Hafeez[86] each checked a box on his respective medical evaluation form indicating that Murphy had repeated episodes of decompensation, each of extended duration, there is no clinical record of any such episodes and no record of any hospitalization for that reason.

Although Murphy concedes the lack of any hospitalizations, she argues that the absence of any hospitalizations is not, of itself, conclusive proof that she did not experience decompensation severe enough to qualify under this portion of the "B" criteria.[87] But although hospitalization, *per se*, is not required, the regulations are very specific as to how decompensation is defined and so how it may be established.

The regulations define decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning," and may be "demonstrated by an exacerbation in symptoms or signs that would ordinarily require

---

[84] *Id.* (citation omitted); *see also*, *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (an ALJ is not required to "spell[] out every consideration that went into the step three determination.").

[85] Tr. at 379.

[86] *Id.* at 364.

[87] ECF # 12 at 11-12.

-16-

increased treatment or a less stressful situation (or a combination of the two)."[88] Such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (*e.g.*, hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode."[89] In addition, the regulations require that there be three episodes of such decompensation within a one-year period, or an average of one episode every four months, and that each episode last for at least two weeks.[90]

     Here, as noted, there were no hospitalizations. Further, there is no evidence of any other proof of a qualifying decompensation, such as a significant alteration in Murphy's medications during any alleged period of decompensation – proof Murphy has not alleged is present. Moreover, there is no evidence of at least three such episodes within a one-year period, with each episode lasting for at least two weeks – again, proof Murphy does not contend is present in the record. Without that proof, which is Murphy's duty to provide, the

---

     [88] *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 711 (6th Cir. 2013) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1 §12.00C(4)).

     [89] *Id.*

     [90] *Id.*

mere conclusory assertion by her doctors that she experienced decompensation is an opinion without any support in the record and so is properly given no weight.[91]

Thus, Murphy has not shown that the ALJ erred in concluding that she had not met the criteria of having periods of decompensation.

In the areas of activities of daily living and social functioning, both aspects of the "B" criteria, the ALJ concluded that Murphy had only mild restrictions.[92] As was the case with their opinions as to decompensation, both Dr. Wentz and Dr. Hafeez opined that Murphy had "marked" restrictions in work-related areas of functioning by simply checking a box on the medical evaluation form.[93] I note that the form is organized by first asking if the claimant's ability to understand and remember instructions in a work environment is affected by his impairment. If the answer is "yes," the form goes further to inquire about whether the limitation in 13 specific areas of work-related function is mild, moderate, marked, or extreme. Similarly, the form asks whether the claimant's mental impairment affects his ability to respond to supervision, to coworkers, and to work pressure. If "yes," the respondent is asked to grade the level of the impairment on the same mild to extreme scale in 11 particular areas.

---

[91] *See*, ECF # 19 at 5. Murphy's assertion, without citation to authority, is that the opinions of her physicians alone are sufficient to establish decompensation, notwithstanding the particular requirements of the regulations.

[92] Tr. at 14.

[93] *Id.* at 379 (Dr. Wentz); 364 (Dr. Hafeez).

I note that this form, as organized, is not a perfect reflection of the "B" criteria in that it deals exclusively, and by its own terms, with work-related functioning and not the broader concerns of activities of daily life or social functioning outside of a work environment. Thus, while the answers to questions on these forms clearly have value in determining whether Murphy qualifies under any of the "B" criteria, the answers have to be understood in context, and with the realization that they are not "on all fours" with the "B" criteria.

That said, I note here that Dr. Hafeez found that Murphy had "marked" restrictions in only one out of 11 areas of work-related social functioning on which he was asked to give an opinion,[94] and found only 4 marked restrictions out of 13 work-related mental activities, one of which specifically addressed working at a consistent pace, which is itself a distinct

---

[94] *Id.* at 363-64. Dr. Hafeez found a marked restriction only in one functional area of "work-related mental activity"– *i.e.*, "travel in unfamiliar places"– while finding merely moderate or mild restrictions in 10 other areas: (1) "interact appropriately with the public;" (2) "ask simple questions or request assistance;" (3) "accept instructions and respond appropriately to criticism from superiors;" (4) "get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes;" (5) "maintain socially appropriate behavior;" (6) "adhere to basic standards of neatness and cleanliness;" (7) "respond appropriately to changes in a routine work setting;" (8) "be aware of normal hazards and take appropriate precautions;" (9) "use public transportation; and (10) "set realistic goals and make plans independently of others."

"B" criteria.[95] Thus, although Dr. Hafeez offered conclusory opinions that Murphy was markedly restricted in activities of daily living and in maintaining social functioning,[96] his answers to very specific questions in these areas do not show support for those conclusion.

Similarly, although Dr. Wentz found more areas of "marked" or even "extreme" restrictions in these individual categories than he found "moderate" restrictions,[97] it must be kept in mind, as it was with Dr. Hafeez, that most (5 out of 9) of his marked or extreme restrictions in work-related mental activities concern concentration, persistence, and pace, which, as noted, constitute a separate "B" criteria from activities of daily living or social functioning. Thus, as was noted with Dr. Hafeez, it cannot be concluded that Dr. Wentz's specific findings, properly understood in context, present clear support for his general

---

[95] *Id.* at 363. Dr. Hafeez found "marked" restrictions in: (1) "remember locations and work-like procedures;" (2) "understand and remember detailed instructions;" (3) "carry out detailed instructions;" (4) "perform at a consistent pace without an unreasonable number and length of rest periods." He found only "moderate" restrictions in: (1) "understand and remember very short, simple instructions;" (2) "carry out very short, simple instructions;" (3) "maintain attention and concentration for extended periods, i.e., 2 hour segments;" (4) "maintain regular attendance and be punctual;" (5) "sustain an ordinary routine without special supervision;" (6) "deal with stress of semi-skilled and skilled work;" (7) "work in coordination with or proximity to others without being unduly distracted;" (8) "make simple work-related decisions;" (9) "complete a normal workday or workweek without interruptions from psychologically based symptoms."

[96] *Id.* at 364.

[97] *Id.* at 378-79. Dr. Wentz found 9 areas of marked or extreme restrictions in the area of work-related mental activities, and 4 areas that the restrictions were only moderate. He found 5 instances of mild or moderate restrictions in the area of interaction with coworkers, while finding an equal number of marked or severe restrictions.

conclusions that Murphy had marked restrictions in activities of daily living and in maintaining social functions.

In addition to the opinions of Dr. Hafeez and Dr. Wentz, Murphy asserts that proof of her meeting the listing is found in the opinion of Diane Lewis, Ph.D., who provided five therapy sessions to Murphy between March and October, 2012.[98] But although Dr. Lewis also checked the conclusory boxes that Murphy had marked restrictions in activities of daily living and in maintaining social functioning,[99] she also did not support those conclusions with her answers to the specific inquiries described earlier. Much as with the other sources, Dr. Lewis found Murphy had mostly mild or moderate restrictions in areas roughly equivalent to social functioning (5 categories to 4 that were checked as marked or extreme),[100] and that Murphy was slightly more likely (7 categories to 6) to have marked or extreme limitations in the area approximately the same as activities of daily life.[101] However, as was discussed above, even what appears to be a majority of responses in favor of finding marked restrictions in activities of daily life does not stand up to scrutiny, since three of the seven responses attest to marked or extreme limitations in areas going to concentration, persistence, and pace, which, as noted, is part of a wholly separate "B" criteria. Thus, as with

---

[98] *See*, ECF # 12 at 14-15.

[99] Tr. at 2107.

[100] *Id.*

[101] *Id.* at 2106.

the other opinions from the other medical sources, Dr. Lewis's conclusory opinions are not supported by the evidence in the record.

Moreover, in addition to the absence of evidentiary support, all these opinions are inconsistent with each other. Even if, as Murphy argues, all these opinions are to receive controlling weight, it is not possible to give controlling weight to all the opinions in all their particulars. For example, Dr. Hafeez and Dr. Lewis each opined that Murphy has only a moderate restriction in maintaining socially appropriate behavior,[102] but Dr. Wentz's opinion is that her restriction here is marked.[103] Even more so is the category of whether Murphy has restrictions on her ability to set realistic goals for herself or make plans independently of others. Dr. Hafeez found only a moderate restriction in this category,[104] while Dr. Wentz found that Murphy's limitation was marked,[105] and Dr. Lewis believed it was extreme.[106]

Accordingly, I find that substantial evidence supports the decision of the ALJ that Murphy has not shown she meets the listing for section 12.04.

## 2.    *The RFC*

The question of whether the ALJ properly dealt with the opinions of Murphy's treating physicians as relates to the RFC is related to, but distinct from, the issue examined

---

[102] *Id.* at 364 (Hafeez), 2107 (Lewis).

[103] *Id.* at 379.

[104] *Id.* at 364.

[105] *Id.* at 379.

[106] *Id.* at 2107.

above. Although the ALJ's conclusion that Murphy did not meet the listing at section 12.04 is supported by the evidence, the same cannot be said for the ALJ's determination of the RFC.

To that point, a review of the record shows that while the limitations of the RFC appear consistent with the medical and opinion evidence for the period prior to 2009, when Murphy underwent back surgery, there is a serious question as to whether the evidence after that event yields the same result. In particular, despite evidence from all her treating sources that any relief from that surgery was only temporary, and that Murphy was, in fact, afflicted with "failed back surgery syndrome," the ALJ nevertheless substantially discounted all the treating source opinions, and the diagnosis of failed back surgery syndrome, to conclude that Murphy's condition improved after surgery, and then remained stable.

That said, however, Murphy does not specify precisely which of the particular restrictions of the RFC are allegedly improper, arguing instead, as she did before, that the ALJ erred in not according controlling weight to the opinions of Dr. Wentz and Dr. Hafeez and so finding that she is totally disabled.[107]

Murphy asserts first that because all three treating source opinions, representing different medical specialties, reached the same conclusion, a higher presumption of controlling weight should be accorded to all three opinions. While that seems to be a meritorious argument, I have not found, nor has Murphy shown me, any case authority in

---

[107] *See*, ECF # 12 at 13-21.

support of that proposition. In fact, while consistency with the record as a whole is a well-known factor in considering the weight accorded to treating source opinions, I have seen no basis for concluding that this is the decisive factor or even a "trump card" when the opinions are not otherwise entitled to controlling weight.

But even setting aside this argument, for the reasons that follow I will find that the ALJ here did not provide good reasons for discounting the treating source opinions.

In that regard, I note first that the ALJ criticizes Dr. Wentz for not showing evidence of upper extremity limitations or neck problems.[108] But this criticism appears to miss the point of Dr. Wentz's opinion, which, in fact, addresses lower back pain and pain in the left lower extremity.[109] Further, although the ALJ claimed that Dr. Wentz's opinion regarding muscle spasms, impaired appetite and joint instability are inconsistent with the treatment record,[110] the ALJ does not cite to the portions of the record that establish such an inconsistency.

---

[108] Tr. at 22.

[109] *Id*. at 367. This focus is consistent with that of Dr. Hafeez, another treating physician, whose opinion also discusses pain in lumbar spine and lower extremity. *See, id.* at 1224.

[110] *Id*. at 22.

-24-

Thus, although the opinions of Dr. Wentz and Dr. Hafeez may be internally inconsistent as they concern particular effects of Murphy's psychological impairments,[111] they are in accord as to her physical limitations, as noted above, and in agreement with Dr. Lewis[112] in the opinion that Murphy's chronic pain caused mental limitations. In sum, the broad consensus that Murphy has physical limitations from failed back surgery syndrome, plus the agreement that her chronic pain produces mental limitations, must be addressed by the ALJ on the record in order to supply a good reason for any decision to significantly discount these opinions. While the other internal inconsistencies noted earlier may well preclude any assignment of decisive or controlling weight to these opinions, a more careful analysis of the relevant areas of agreement and disagreement is required before any final assessment of weight is made.

---

[111]  For example, in the 11 individual categories addressing Murphy's ability to deal with coworkers and to handle work pressure, Dr. Hafeez opined that Murphy had only moderate impairments in every category except for her ability to travel to unfamiliar places. Further, in the 13 categories concerning work-related activities, Dr. Hafeez stated Murphy had only moderate impairment in her ability to remember and carry out short, simple instructions; to maintain attention and concentration for extended periods; to maintain regular attendance and be punctual; and to complete a normal workday or workweek without interruptions from psychologically based symptoms. And he made these findings while also stating his belief that Murphy has a low I.Q. or reduced intellectual functioning and giving his conclusion that she would likely be absent more than three times a month.

By contrast, Dr. Wentz did not believe that Murphy has either a low I.Q. or reduced intellectual functioning, and found Murphy had a "marked" restriction in her ability to maintain attention and concentration for an extended period and "extreme" restrictions in her ability to maintain regular attendance and to complete a normal workday and workweek.

[112]  *Id.* at 2014.

Further, as also noted, any reconsideration of weight should take into account the possibility that the evidence establishes a later onset date, consistent with the existing diagnosis of failed back surgery syndrome.

## Conclusion

Therefore, for the reasons stated, substantial evidence does not support the finding of the Commissioner that Murphy had no disability. The denial of Murphy's applications is therefore reversed, and the matter remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: August 18, 2015                    s/ William H. Baughman, Jr.
                                          United States Magistrate Judge